UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ALEJANDRO GUTIERREZ,<br>Plaintiff,<br>v.<br>FRIENDFINDER NETWORKS INC.,<br>Defendant. | Case No. 18-cv-05918-BLF<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION; STAYING ACTION**<br><br>[Re: ECF 11] |

Before the Court is Defendant FriendFinder Networks, Inc.'s motion to compel arbitration and to dismiss under Federal Rule of Civil Procedure 12(b)(1). Mot., ECF 11. The Court heard argument on the motion on April 11, 2019. For the reasons discussed herein, the motion is GRANTED, and the action is STAYED pending arbitration.

I. **BACKGROUND**

Defendant FriendFinder Networks, Inc.'s wholly-owned subsidiary owns and operates the website AdultFriendFinder ("AFF"), www.adultfriendfinder.com, an adult online dating site. Compl. ¶ 1, ECF 1-1; Buckheit Decl. ISO Mot. ¶ 7, ECF 13. Users of the website are required to register in order to use the site but otherwise may use the website for free. Buckheit Decl. ¶¶ 8–9[1]; *see* Compl. ¶¶ 18, 21. However, users can pay for certain upgrades or to access certain services. Buckheit Decl. ¶ 8. As part of the registration process, AFF collects users' personal information, including names and email addresses, billing information, and other content the users might submit. Compl. ¶ 21. Use of AFF is governed by the site's Terms of Use ("Terms"). Buckheit

---

[1] Plaintiff's objections to the paragraphs in and exhibits to the Buckheit Declaration cited in this section, *see* Opp. at 9–10, to the extent they are valid, are mooted by Mr. Buckheit's averments in his Supplemental Declaration, ECF 34-2.

Decl. ¶¶ 9–15. As discussed in more detail in the discussion section below, the Court assumes that, during the relevant time period, users did not have to explicitly agree to the Terms in order to register for or use the site, but that the Terms were readily accessible to users throughout the site. AFF has updated its Terms at various times, including in July 2002, October 2009, and November 2011. Buckheit Decl. ¶ 13.

Plaintiff Alejandro Gutierrez is a long time user of AFF. He alleges he joined the site in 1998, Compl. ¶ 13, and Defendant's records indicate he registered on July 24, 2003, Buckheit Decl. ¶ 35. Plaintiff continued to use the site until at least September 6, 2018. Buckheit Decl. ¶¶ 35, 48 & Ex. M, ECF 13-3. Throughout this time, Plaintiff provided personal information to AFF, including his name, address, credit card numbers, and photos. Compl. ¶ 13. He also made 39 credit card transactions on the site during this time. Buckheit Decl. ¶ 43 & Ex. M.

Plaintiff alleges that in October 2016 "a hacker or group of hackers breached Defendant's system and downloaded two decades worth of personal information of 339 million AFF users." Compl. ¶ 32. Based on this breach, and Defendant's alleged failure to prevent and timely cure it, Plaintiff brings this putative class action, alleging the following causes of action: (1) negligence; (2) breach of implied contract; (3) invasion of privacy; (4) violation of California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*; (5) violation of California's Online Privacy Act, Cal Bus. & Prof. Code §§ 22575, *et seq.*; and (6) violation of California's Unfair Competition Law ("UCL"), Cal. Bus & Prof. Code §§ 17200, *et seq*. *See generally* Compl.

Defendant now moves to compel arbitration and dismiss the action based on the arbitration provision contained in the Terms.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to arbitration agreements affecting interstate commerce. 9 U.S.C. §§ 1 *et seq.* When it applies, the FAA preempts state laws that conflict with its provisions or obstruct its objective to enforce valid arbitration agreements. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 341–43 (2011). Although section four of the FAA provides for the filing of a motion to compel arbitration, courts have held that a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction "is a procedurally sufficient mechanism

2

to enforce [an] [a]rbitration [p]rovision." *GT Sec., Inc. v. Klastech GmbH*, Case No. 13-cv-3090-JCS, 2014 WL 2928013, at *17 (N.D. Cal. June 27, 2014).

The FAA reflects a strong policy in favor of arbitration. *Concepcion*, 563 U.S. at 339; *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street*, 35 Cal. 3d 312, 322 (1983). Under the FAA, contractual arbitration agreements must be enforced "save upon such grounds as exist at law or in equity for the revocation of any contract." *Newton v. Am. Debt Servs., Inc.*, 549 Fed. App'x. 692, 693 (9th Cir. 2013) (quoting 9 U.S.C. § 2). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Concepcion*, 563 U.S. at 339 (internal citations omitted); *Weeks v. Crow*, 113 Cal. App. 3d 350, 353 (1980) ("The court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made." (citation omitted)). "[W]here a contract contains an arbitration clause," moreover, "courts apply a presumption in favor of arbitrability . . . and the party resisting arbitration bears the burden of establishing that the arbitration agreement is inapplicable." *Wynn Resorts v. Atl.-Pac. Capital, Inc.*, 497 Fed. App'x. 740, 742 (9th Cir. 2012).

When faced with a petition to compel arbitration, the district court's role is a discrete and narrow one. "By its terms, the [FAA] 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)) (emphasis added). The court's role under the FAA is limited to determining "two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. Aug. 11, 2015). "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron*, 207 F.3d at 1130 (citations omitted). The party seeking to compel arbitration bears the "burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomms Am., LLC,* 845 F.3d 1279, 1283 (9th Cir. 2017) (citation omitted). In analyzing

3

whether a contract exists, courts "apply ordinary state-law principles that govern the formation of contracts." *Id.*

However, parties can also "agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent–A–Ctr., West, Inc. v. Jackson*, 561 U.S. at 63, 68–69 (2010). "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (internal citations omitted). Whether the court or the arbitrator decides arbitrability is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). For arbitration agreements under the FAA, "the court is to make the arbitrability determination by applying the federal substantive law of arbitrability absent clear and unmistakable evidence that the parties agreed to apply non-federal arbitrability law." *Brennan*, 796 F.3d at 1129 (internal citations and quotation marks omitted).

## III. DISCUSSION

Defendant argues that the Court must compel arbitration because there was a binding contract with a valid arbitration clause (embodied in the Terms) that covers the claims at issue. Plaintiff argues that he never agreed to any contract requiring arbitration and that even if he had, the contract to arbitrate is unenforceable due to unconscionability. *See generally* Opp, ECF 33. The Court discusses each of Plaintiff's arguments in turn.

### A. Plaintiff Agreed to the Terms of Use in 2013

The parties first dispute whether Plaintiff agreed to the Terms. Defendant presents evidence that it believes demonstrates that Plaintiff agreed to the Terms in at least three ways: First, when Plaintiff registered for AFF in July 2003, Plaintiff was required to agree to the Terms. *See* Mot. at 3, 6–7. Second, when Plaintiff made credit card transactions on the site between 2003 and September 2018, he "confirmed his agreement" to the Terms. *See id.* at 7. And third, in 2013, in the course of restoring his access to AFF after he was cited for violating AFF's chat room rules,

4

Plaintiff agreed to the Terms in order to restore his access. *See id.* at 8. Each one of these purported agreements occurred before the alleged data breach in October 2016.

Plaintiff's core argument is that he did not agree to the Terms at any time. In support of this argument, Plaintiff presents evidence contradicting all three of Defendant's purported agreement methods. Because the Court finds that Defendant's undisputed evidence with respect to the third purported agreement method—Plaintiff's 2013 interactions with Defendant relating to his temporary ban from the site—is sufficient to demonstrate that Plaintiff agreed to the Terms, the Court does not discuss the competing evidence and arguments with respect to the first two purported agreement methods. For purposes of the below discussion, the Court accepts Plaintiff's arguments and evidence that at all relevant times, including in both 2003 and 2013, Plaintiff was able to use the website without expressly agreeing to the Terms—*i.e.*, that Defendant's website used a "browsewrap" agreement, as defined below. The Court first discusses the relevant law and then turns to the material evidence and analysis here.

### 1. Relevant Law

The Ninth Circuit's decision in *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) guides the decision in this case. In *Nguyen*, the Ninth Circuit determined that the plaintiff had not agreed to the defendant's terms of use (and the arbitration clause therein) by purchasing a product on the defendant's website, even though the terms were displayed on every page of the website and on each page of the website's online-checkout process. The court rejected the defendant's argument that "the placement of the 'terms of use' hyperlink on its website put [the plaintiff] on constructive notice of the arbitration agreement" such that the plaintiff's "subsequent use of the website[] was enough to bind him to the Terms of Use." *Id.* at 1174–75, 1178–79.

In reaching this conclusion, the court first set forth the basic legal framework governing online contracts:

> Contracts formed on the Internet come primarily in two flavors: "clickwrap" (or "click-through") agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. . . . Unlike a clickwrap agreement, a browsewrap agreement does not require

5

> the user to manifest assent to the terms and conditions expressly . . . a party instead gives his assent simply by using the website. . . . The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists.

*Id.* at 1175–76 (citations, alterations, and internal quotation marks omitted). The Ninth Circuit noted that courts are "traditional[ly] reluctant to enforce browsewrap agreements against individual consumers." *Id.* at 1178. Though Defendant here argues that AFF presented a hybrid clickwrap/browsewrap agreement to its users, *see* Mot. at 10–11, the Court accepts Plaintiff's evidence indicating that AFF used only a browsewrap agreement—that is, that AFF did not require its users to expressly consent to the Terms or to visit the page containing the Terms before registering and using the site. *Nguyen*, like this case, involved a browsewrap agreement.

The Ninth Circuit then set forth the foundational rule governing browsewrap agreements: "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen*, 763 F.3d at 1176 (citation omitted). In line with this rule, the court noted that "[w]ere there any evidence in the record that [the plaintiff] had actual notice of the Terms of Use or was required to affirmatively acknowledge the Terms of Use before completing his online purchase, the outcome of th[e] case might be different." *Id.* "Indeed," it said, "courts have consistently enforced browsewrap agreements where the user had actual notice of the agreement." *Id.* (citing cases). The court also noted two other scenarios in which courts have been willing to enforce browsewrap agreements: First, "where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Id.* And second, based on an "inquiry notice" theory, "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." *Id.* at 1177.

Ultimately, the court held that the defendant's website did not meet any of these requirements, indicating that the plaintiff did not have notice—actual, constructive, or inquiry—of

the terms and thus that the plaintiff had not agreed to be bound. *Id.* at 1178–79. The court emphasized that "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* at 1179; *accord McGhee v. N. Am. Bancard, LLC*, 755 F. App'x 718, 719 (9th Cir. 2019) ("The onus fell on [the defendant] to put its customers on notice of the binding terms of the contract in a clear and straightforward way."). It concluded that "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Id.*

### 2. Material Facts

Plaintiff challenges much of Defendant's evidence surrounding his purported agreement to the Terms in 2013. For example, though it is undisputed that Plaintiff in late-2013 violated the Terms while using AFF's chatroom and lost access to some or all of the website, the parties dispute whether Plaintiff lost access to the entire site or only to the chatroom. *Compare* Gutierrez Decl. ¶ 8 *with* Buckheit Decl. ¶¶ 45–47. The parties also dispute the content of certain emails Defendant sent to Plaintiff regarding the suspension and whether Plaintiff responded to those emails. *Compare* Mot. at 12 (citing evidence) *with* Opp. at 5–6 (citing evidence). And, as discussed above, the parties dispute whether Plaintiff was required to agree to the Terms in order to use the site (*i.e.*, whether the site used a browsewrap agreement). Plaintiff requests a jury trial pursuant to 9 U.S.C. § 4 if the Court finds that there are disputes of material fact as to whether Plaintiff agreed to be bound to the Terms. Opp. at 1, 13.

The Court finds that none of the disputed facts is material to resolving the motion. As discussed below, only a few key facts are material to reaching the conclusion in this case, none of which is disputed. As such, the Court need not make any credibility determinations to resolve the motion, and it draws all reasonable inferences in Plaintiff's favor, including that the site included only a browsewrap agreement and that Plaintiff was not required to explicitly consent to the Terms in 2013. As such, an evidentiary hearing or jury trial is not necessary in this case.

Once the Court narrows the issue to only the material facts, only one of Plaintiff's evidentiary objections is relevant. The Court first addresses that objection and then sets forth the undisputed material facts necessary to resolve the motion.

7

*a. Relevant Evidentiary Objections*

In support of its reply brief, Defendant submits the Supplemental Declaration of Jonathan B. Buckheit. ECF 34-2. Exhibit 9 to the Supplemental Buckheit Declaration is an audio recording of a telephone call between Plaintiff and Defendant's customer service representative. Exhibit 10 to that declaration is a transcript of the call. The Court will cite the transcript for ease of reference. At the beginning of the call, the customer service representative informed Plaintiff that "[t]his call will be recorded for quality control purposes." Buckheit Suppl. Decl., Ex. 10 at 1 ("Call Tr."), ECF 34-2. Plaintiff objects to the Court's considering the two exhibits because (1) Defendant's use of the recording for evidentiary purposes violates the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq.*; and (2) Defendant improperly submitted this new evidence on reply. *See* Evid. Obj. at 2, 4–5, ECF 36.

Taking the second argument first, Plaintiff sought (ECF 39) and the Court granted (ECF 44) the right for Plaintiff to file a sur-reply to address Defendant's new evidence. As such, the Court is satisfied that Plaintiff was not prejudiced by Defendant's inclusion of material evidence in reply.

As to the more substantive CIPA argument, Plaintiff argues that because Defendant told Plaintiff that the phone call would be recorded only for quality control purposes, Plaintiff did not consent to use of the call as evidence in this litigation. Evid. Obj. at 2 (citing cases). Plaintiff's arguments are insufficient to warrant exclusion based on CIPA for many reasons. First, Plaintiff cites only the legislative finding and intent section of CIPA (Penal Code § 630) without citation to any specific provision of CIPA, much less to the legal elements the Court would need to consider to determine whether Defendant violated CIPA. Second, it appears that Defendant's actions would not violate the seemingly relevant provisions of CIPA. CIPA § 631, which criminalizes eavesdropping by certain means, has been held to bar only third-party monitoring of conversations. *See Powell v. Union Pac. R. Co.*, 864 F. Supp. 2d 949, 955 (E.D. Cal. 2012) (citing cases). CIPA § 632 requires a "confidential communication," meaning the party making the CIPA claim must have "an objectively reasonable expectation that the conversation is not being overheard or recorded." *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *22

1  (N.D. Cal. Sept. 26, 2013) (quoting *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013)). Plaintiff clearly does not meet this standard here, since the customer service representative told him he was being recorded.

Third and finally, Plaintiff's sole case to which he analogizes falls far short of supporting his argument here. Plaintiff attempts to argue that the court's decision in *In re Google*, 2013 WL 5423918, concerning the scope of the Federal Wiretap Act demonstrates that Plaintiff did not consent to use of the recording for evidentiary purposes as required under CIPA. Plaintiff then cites *Warden v. Kahn*, 99 Cal. App. 3d 805, 810 (Ct. App. 1979), for the proposition that CIPA is more restrictive than the Federal Wiretap Act.

Even assuming Plaintiff's implicit argument that cases concerning the Federal Wiretap Act are directly analogous to cases involving CIPA (a largely unpersuasive proposition), *In re Google* is of limited value here. In that case, the plaintiffs alleged that defendant Google had "intercepted, read and acquired the content of emails that were sent or received by Gmail users while the emails were in transit." 2013 WL 5423918, at *1. The first major distinction from this case then is that *In re Google* involved third-party interception of communications between two participants in the conversation. Indeed, the court in *In re Google* explicitly distinguished cases in which courts have found that email participants consent to recording of emails by other participants. *Id.* at *14. These distinguished cases are more analogous than *In re Google* to what occurred here

Moreover, in determining whether the plaintiffs had consented to interception of their emails for the purpose of targeted advertising, the *In re Google* court held that the plaintiffs had not consented, even though the terms of service to which the plaintiffs had agreed allowed Google to intercept emails for a different purpose—to screen them for objectionable material. *Id.* at *13. The court held that the plaintiffs had only consented to the emails being "intercepted under a different set of circumstances for a different purpose." *Id.* This is seemingly the portion of the opinion on which Plaintiff hangs his hat—Plaintiff too consented to the recording for limited purposes only (*i.e.*, quality control). However, the *In re Google* court went on to say that the process for intercepting emails to screen them and the process for intercepting them to use them for advertising purposes were independent—that is, Google's interception for the two separate

9

purposes was achieved through two separate means. "Because the two processes were allegedly separate," the court said, "consent to one does not equate to consent to the other." *Id.* Here, there was only a single process for recording the call, and Plaintiff was aware of and consented to that recording.

Because Plaintiff's briefing falls woefully short of demonstrating the Defendant violated CIPA, or that the evidence should otherwise be excluded, the evidentiary objection is OVERRULED.

### b. Undisputed, Material Facts

Throughout the relevant time, the website contained on multiple pages hyperlinks to the Terms. *See* Gutierrez Decl. ¶¶ 3–4; *see generally* Butler Affidavits, ECF 33-3, 33-4; Rahman Decl., Ex. 6, ECF 14-6; Rahman Suppl. Decl. ¶¶ 7, 15, ECF 34-1; Buckheit Decl. ¶ 31; Buckheit Suppl. Decl. ¶¶ 5, 17 & Ex. 8.[2] But drawing all reasonable inferences for Plaintiff and considering Plaintiff's evidence where there is a dispute, the website did not require Plaintiff to agree to the Terms or otherwise acknowledge that he had read them. *See, e.g.*, Butler Affidavit, Ex. A, ECF 33-3.

On November 1, 2013, Plaintiff had a telephone call with Defendant's customer service representative. Gutierrez Decl. ¶ 8, ECF 33-1; Buckheit Decl. ¶¶ 45, 46; Buckheit Decl., Ex. O, ECF 13-15. Plaintiff called Defendant because he had lost access to all or some of the website, and he was trying to determine how to regain access. Gutierrez Decl. ¶¶ 7, 8. Though Mr. Gutierrez avers that during the call the customer service representative never mentioned the Terms to him, *id.* ¶ 8, the transcript of the call makes clear that the customer service representative did mention the Terms. The following recounts the material portions of that conversation:

> CS2 [Customer Service Representative] – Thank you that is correct. You mention that you got banned on the chat, I checked the account here that yeah you got banned in the chat because you posted your email address and, uh, it is a violation of our Terms of Use.
>
> AG [Plaintiff] – Yeah.

---

[2] Plaintiff's objections to the foregoing paragraphs in the Rahman and Buckheit Declarations, *see* Opp. at 10, are mooted by Mr. Rahman's and Mr. Buckheit's averments in their Supplemental Declarations.

10

> CS2 – We sent you an email stating that you need to agree to the Terms of Use so that we can unban you or unblock you in the chat. Did you receive the sent email?
>
> AG – No is that the aol email right?
>
> CS2 – Yes the one in the *indistinguishable* yes, we sent you an email that you need to um, agree or reply stating that you agree to the Terms of Use. Have you received it? If not I'll send it to your email again.
>
> AG – Oh I don't know I haven't checked, hold on.
>
> CS2 – Sure.
>
> AG – Why, why is it such a big deal to put that on there?
>
> CS2 – Because we set restrictions on the website so you need to follow our rules and regulations.
>
> AG – Yeah I know but what I'm trying to see is why that's a problem.
>
> . . .
>
> AG – There it is, uh, I got two emails, uh account banned and an abuse violation. Which one is it?
>
> CS2 – You can reply to both of them, it will be directed to our email support of abuse, within 24 hours your account will be reactivated, or your access to the chat will be reactivated.

Call. Tr. at 3–4. The parties dispute whether Plaintiff agreed to the Terms before regaining access, so the Court assumes that Plaintiff did not ever expressly agree to the Terms before regaining access.

At the time of the 2013 phone call, the AFF Terms of Use contained the following relevant provisions, Mot. at 15 & n.3:

First, it stated in bold capital letters at the top: "Important legal notice. Please read the following terms of use ("terms") carefully. These terms govern your use of this website and the services offered through the website. These terms set forth a binding agreement between you and Various, Inc. [Defendant]." Buckheit Decl., Ex. D ("2011 Terms"), ECF 13-4.

Under section 1, entitled "Acceptance of Terms of Use," the Terms stated, in relevant part:

> 1. **Acceptance of Terms of Use.** These Terms of Use ("Terms") constitute a binding agreement between you and Various, Inc. ("Various," "we," "us" or "our"), a subsidiary of Friend Finder Networks Inc., and govern your use of Various, Inc.'s Adult FriendFinder ("Website") and the content, products and services offered through the Website (collectively with the Website, the "Services"). By accessing, viewing or using any Services, you represent and warrant that you are at least 18 years old and the age of majority and legal consent in the jurisdiction in which you

live or reside, and you agree to be bound by and subject to these Terms. If you do not agree to these Terms, you should not check or click on, or otherwise agree to, these Terms, and you should immediately leave this page and not access or use the Website or any other Services. Upon our request, you agree to sign a non-electronic version of these Terms.

2011 Terms § 1.

### 3. Analysis

On these facts, Plaintiff agreed to be bound by the Terms. Plaintiff's call with the customer service representative in 2013 gave him at least inquiry notice of the Terms. The customer service representative informed Plaintiff that he had been banned because he violated the Terms. Call. Tr. at 3–4. A few seconds later, when Plaintiff asked for further elaboration as to why he had been banned from the chat, the customer service representative reiterated: "Because we set restrictions on the website so you need to follow our rules and regulations." *Id.* This constituted notice to Plaintiff that if he wanted to use the site, he needed to comply with the Terms. *See Nguyen*, 763 F.3d at 1177 ("[W]here the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements."). Plaintiff responded with "Yeah I know," acknowledging that he understood that he needed to follow those rules and regulations when using the site. Call Tr. at 3–4. And the Terms were readily available to Plaintiff on the website, such that his failure to read them, despite knowing he was bound by them, cannot absolve him of his need to comply with them. *See Nguyen*, 763 F.3d at 1179; *see also Vernon v. Drexel Burnham & Co.*, 52 Cal. App. 3d 706, 714 (1975) ("[F]ailure to read a contract before signing is not in itself a reason to refuse its enforcement." (citation omitted)). Because the Terms clearly stated that continued use of the site would constitute acceptance of the Terms, Plaintiff's continued use of the site after being put on notice of the Terms and his need to comply with them constituted acceptance of the Terms. *See, e.g.*, *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04–04825, 2005 WL 756610, at *2, *4–5 (N.D. Cal. Apr. 1, 2005) ("Cairo's use of CMS's web site under circumstances in which Cairo had actual or imputed knowledge of CMS's terms effectively binds Cairo to CMS's Terms of Use and the forum selection clause therein.").

Plaintiff argues that the call transcript does not show that Plaintiff agreed to the Terms.

12

*See* Sur-Reply at 2–3, ECF 46. Responding to Defendant's arguments, Plaintiff narrowly focuses on the parties' dispute regarding why Plaintiff's access was restored. Reading the facts in Plaintiff's favor, the Court assumes that Plaintiff did not need to agree to the Terms in order to restore his access. But this fact is of no moment. Regardless whether Plaintiff assented to the Terms to restore his access, he continued to use the website knowing that his use of the site was governed by the Terms. This use of the site, in light of the Terms' provisions regarding acceptance by use, constituted acceptance of the Terms. *See Nguyen*, 763 F.3d at 1177 (citing *Cairo*, 2005 WL 756610, at *2, *4–*5). Even if company policy required that Plaintiff accept the Terms by email or phone to have his access restored, as Plaintiff argues, Sur-Reply at 3, this was not the sole means of acceptance of the Terms, as the Terms themselves make clear, *see* 2011 Terms § 1 ("By accessing, viewing or using any Services, you represent and warrant that you . . . agree to be bound by and subject to these Terms.").

Thus, because Plaintiff had at least inquiry notice of his need to comply with the Terms in using the website, and he continued to use the site knowing he was bound by the Terms, the Court holds that Plaintiff accepted the Terms by using the site.

### B. The Terms Delegate Questions of Arbitrability to the Arbitrator

Plaintiff argues that even if the Court finds he agreed to the Terms, the arbitration provision is unconscionable, and thus unenforceable against Plaintiff. Opp. at 22–25. Defendant argues that the Terms "clearly and unmistakably" delegate questions of arbitrability (*e.g.*, the validity of the arbitration provision) to the arbitrator, such that the Court should not address whether the arbitration provision is conscionable. Mot. at 18 – 21. Plaintiff effectively concedes that the 2011 Terms delegate questions of arbitrability to the arbitrator. *See* Opp. at 22–25 (arguing that both the arbitration provision and the delegation clause are unconscionable). However, the Court briefly addresses this issue.

As discussed above, Plaintiff agreed to the Terms in November 2013, when the Terms as amended in 2011 governed. *See* Buckheit Decl. ¶ 13. These same Terms governed in October 2016 when the alleged breach at issue in the Complaint occurred. *Id.* As an initial matter, the 2011 Terms make clear that the Court should determine the arbitrability issue by applying federal

13

substantive law because the Terms are covered by the FAA. The arbitration provision states in relevant part "[t]his [arbitration] Section and Section 25 below are subject to the Federal Arbitration Act, 9 U.S.C. sec. 1-16 (FAA), as amended." 2011 Terms § 24. Plaintiff does not argue otherwise. *See generally* Opp.

The Court agrees with Defendant that the 2011 Terms "clearly and unmistakably" delegate questions of arbitrability to the arbitrator. *Howsam*, 537 U.S. at 83. Section 24 of the Terms, which sets forth the arbitration provision, states in relevant part:

> 24. **Arbitration of Disputes.** ANY CLAIM, DISPUTE, OR CONTROVERSY (WHETHER IN CONTRACT, TORT, OR OTHERWISE, WHETHER PREEXISTING, PRESENT OR FUTURE, AND INCLUDING STATUTORY, CONSUMER PROTECTION, COMMON LAW, INTENTIONAL TORT AND EQUITABLE CLAIMS) BETWEEN YOU AND US OR ANY OF OUR AFFILIATED ENTITIES OR OURS OR THEIR AGENTS, EMPLOYEES, PRINCIPALS, SUCCESSORS, OR ASSIGNS ARISING FROM OR RELATING TO THESE TERMS, ITS INTERPRETATION, OR THE BREACH, TERMINATION OR VALIDITY HEREOF, OR THE RELATIONSHIPS WHICH RESULT FROM THESE TERM [sic] (INCLUDING, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, RELATIONSHIPS WITH THIRD PARTIES WHO ARE NOT SIGNATORIES TO THIS AGREEMENT), SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY JAMS before a retired judge in Santa Clara County, California. In the event such a JAMS proceeding is unavailable for any reason, such disputes shall be governed by the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by these Terms, and will be administered by the AAA before a single retired judge. The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity. . . .

2011 Terms § 24.

This provision contains two indications that the parties intended to have the arbitrator decide questions of arbitrability. First, the provision states that "any claim, dispute, or controversy . . . between you and us . . . relating to these Terms, its interpretation, or the breach, termination or *validity* hereof . . . shall be resolved exclusively and finally by binding arbitration." *Id.* (emphasis added). In *Mamot v. Mastro*, the Ninth Circuit held that the parties clearly and unmistakably delegated the question of arbitrability by including language in the contract stating that "'the validity or application of any of the provisions' of the arbitration clause" were subject to

14

binding arbitration. 652 F.3d 982, 988 (9th Cir. 2011). In *Meadows v. Dickey's Barbecue Restaurants Inc.*, Judge Tigar held that *Momot* applied equally to an agreement stating that "disputes regarding 'any provision of this Agreement' or 'the validity of this Agreement or any other agreement between the parties, or any provision thereof' must be 'submitted for binding arbitration,'" where such language was included in the arbitration provision itself. 144 F. Supp. 3d 1069, 1076 & n.3 (N.D. Cal. 2015). The *Meadows* language closely mirrors the language here, and the Court agrees that the inclusion of language stating that the validity of the agreement is to be arbitrated, when incorporated in the arbitration provision, indicates that the parties intended to arbitrate questions of arbitrability.

Second, the provision incorporates JAMS and AAA rules. The Ninth Circuit in *Brennan* held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability," at least where those parties are both sophisticated. 796 F.3d 1125, 1130 (9th Cir. 2015). Following *Brennan*, courts in this district have diverged on whether the holding in *Brennan* applies to contracts involving at least one unsophisticated party. *Compare Ingalls v. Spotify USA, Inc.*, No. C 16-03533 WHA, 2016 WL 6679561, at *3 (N.D. Cal. Nov. 14, 2016) ("Every district court decision in our circuit to address the question since Brennan has held that incorporation of AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party.") *with Miller v. Time Warner Cable Inc.*, No. 816CV00329, 2016 WL 7471302, at *5 (C.D. Cal. Dec. 27, 2016) ("[T]he greater weight of authority has concluded that the holding of [*Brennan*] applies similarly to non-sophisticated parties."). At least one court has applied *Brennan* when the JAMS rules are referenced. *See Esquer v. Educ. Mgmt. Corp.*, 292 F. Supp. 3d 1005, 1012–13 (S.D. Cal. 2017).

In this case, the Court need not determine whether reference to the AAA or JAMS rules alone is sufficient to warrant compelling questions of arbitrability because of the "validity" language above. However, *Brennan* demonstrates that incorporation of those rules is certainly a factor pointing toward a clear and unmistakable delegation of arbitrability. Indeed, the Ninth Circuit in *Brennan* recognized that "the vast majority of the circuits that hold that incorporation of . . . AAA rules constitutes clear and unmistakable evidence of the parties' intent do so without

15

explicitly limiting that holding to sophisticated parties or to commercial contracts." 796 F.3d at 1130–31 (collecting cases). As such, the Court holds that in combination with the language governing arbitration of validity issues, incorporation of the JAMS and AAA rules constitutes a clear and unmistakable delegation of questions of arbitrability.

### C. The Delegation Provision Is Not Unconscionable

Because the Court has held that the Terms clearly and unmistakably delegate questions of arbitrability to the arbitrator, "the only remaining question is whether the particular agreement to delegate arbitrability—the Delegation Provision—is itself unconscionable." *Brennan*, 796 F.3d at 1132. Plaintiff raises several arguments for why the delegation clause contained in the 2011 Terms is unconscionable. *See* Opp. at 22–25. The Court first sets forth the relevant law then discusses Plaintiff's arguments.

#### 1. Unconscionability Law

Under California law, "'unconscionability has both a 'procedural' and a 'substantive' element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 114 (2000) (internal quotation marks omitted) (quoting *A & M Produce Co. v. FMC Corp.*, 186 Cal. Rptr. 114, 121–22 (1982)). A contract must be both substantively and procedurally unconscionable for a court to find the contract unconscionable. *Id.* However, the procedural and substantive unconscionability "need not be present in the same degree. Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves." *Id.* (citation omitted). "[U]nconscionability requires a substantial degree of unfairness beyond a simple old-fashioned bad bargain." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1210 (9th Cir. 2016) (quoting *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 12 (2016)). Rather, unconscionable contracts are those that are "so one-sided as to 'shock the conscience.'" *Id.* (quoting *Baltazar*, 367 P.3d at 12). To reiterate, "[w]hen considering an unconscionability challenge to a delegation provision, the court must consider only arguments 'specific to the delegation provision.'" *Id.* (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 73 (2010)).

16

"The party resisting arbitration bears the burden of proving unconscionability." *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 247 (2012).

### 2. The Delegation Provision Is Not Unconscionable

Plaintiff argues that the delegation provision[3] is unconscionable for several reasons, none of which is availing.

Plaintiff first argues that the delegation provision is procedurally unconscionable because it is a contract of adhesion that bears the characteristics of oppression or surprise. *See* Opp. at 22–23 (citing *Pinnacle*, 55 Cal. 4th at 247). "Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." *Pinnacle*, 55 Cal. 4th at 247 (citation omitted). Plaintiff argues that the contract was oppressive essentially because it was adhesive. *See* Opp. at 23. Defendant argues that it was not oppressive because the website is free and users have "meaningful choices when it comes to online dating" such that they can choose to take their business elsewhere. Mot. at 17; Reply at 6, ECF 34 (citing *Darnaa, LLC v. Google, Inc.*, No. 15-CV-03221-RMW, 2015 WL 7753406, at *2 (N.D. Cal. Dec. 2, 2015)). Plaintiff counters that California courts have "rejected the notion that the availability in the marketplace of substitute employment, goods, or services *alone* can defeat a claim of procedural unconscionability." Opp. at 23 (quoting *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1283 (9th Cir. 2006)). The Court agrees with Plaintiff that the adhesive nature of the contract demonstrates a degree of procedural unconscionability, even though Plaintiff had other options. However, the Ninth Circuit has made clear that "the adhesive nature of a contract, without more, would give rise to a low degree of procedural unconscionability at most." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261–62 (9th Cir. 2017); *see also Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862, 862–64 (9th Cir. 2017) ("[Adhesion] creates only a minimal degree [of procedural unconscionability] under California law."); *Darnaa*, 2015 WL 7753406, at *2 (finding marginal degree of procedural

---

[3] Many of Plaintiff's arguments are directed at both the delegation provision and the arbitration provision as a whole. Any reference in this section to "the contract" refers specifically to the delegation provision.

17

unconsciousability in light of adhesive nature of contract). As such, the Court finds that the adhesive nature of the contract demonstrates only a slight degree of procedural unconscionability.

Plaintiff's argument that the contract is more procedurally unconscionable based on surprise is not persuasive. First, several of these arguments are moot because the Court found that Plaintiff agreed to the 2011 Terms in 2013. For example, Plaintiff argues that the "browsewrap nature and inconspicuous formatting and location of the TOU Link" on the website "heightened the degree of unfair surprise," as did Defendant's decision to change the Terms in 2011 without notice to its users. However, both of these arguments are negated as to Plaintiff because Defendant provided express notice of the 2011 Terms to Plaintiff in 2013. Plaintiff's sole remaining argument is that the delegation provision is "buried 'within a prolix printed form' consisting of pages of densely printed text." Opp. at 23 (quoting *Pinnacle*, 55 Cal. 4th at 247). The Court disagrees that the format of the delegation provision indicates a high degree of procedural unconscionability. The arbitration provision itself, which includes the delegation provision, appears in a separate article under a bold and underlined heading entitled "Arbitration of Disputes" on the fifth page of a six-page agreement. 2011 Terms § 24; *see Pinnacle*, 55 Cal. 4th at 247 n.12. Within this section, the delegation provision discussing the arbitration of the validity of disputes appears in all caps, while the reference to the JAMS and AAA rules is in lowercase writing in the center of the paragraph. *Id.* This format is sufficient to avoid substantial procedural unconscionability. *See Wiseley*, 709 F. App'x at 864 ("There is no procedural unconscionability in the presentation of the arbitration clause itself, which appears in the same size font as the rest of the COU, with key terms bolded." (citing *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 914 (2015))). In any event, "a finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided." *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 915 (2015) (citation omitted).

Here, the delegation provision is not substantively unconscionable. "Because [Plaintiff] has shown only a minimal degree of procedural unconscionability under California law, a high degree of substantive unconscionability is required under the sliding-scale approach." *Wiseley*,

709 F. App'x at 864 n.1. Plaintiff makes the following three arguments as to why the arbitration provision as a whole is substantively unconscionable, arguing that each of these arguments applies equally to the delegation provision: "(1) they impose burdensome arbitration costs on consumers; (2) they contain unilateral modification provisions; and (3) they limit Plaintiff's statutory remedies." Opp. at 24.

The Court declines to address Plaintiff's third argument because it is "not specific to the delegation provision." *Rent-A-Ctr.*, 561 U.S. at 73. Plaintiff argues that the Terms are unconscionable because they "limit the statute of limitations applicable to claims against Defendant to one year, compared with the two to four years applicable to Plaintiff's claims." Opp. at 25 (emphasis omitted) (citing Buckheit Decl. Ex. D at ¶ 33). This argument is not specific to the delegation provision, and thus is a question of arbitrability for the arbitrator.

As to Plaintiff's first argument, in his Opposition he argued that he would be required to pay half of the arbitration expenses. Opp. at 24. However, Plaintiff recognized at the hearing on the motion that he cited to the wrong version of the AAA rules in his brief. Tr. at 21:17–21, ECF 53. The applicable AAA rules require Defendant to pay the costs of arbitration, as do the relevant JAMS rules. *See* Hammond Decl. ISO Opp., Ex. 4 at 14, 33–37; Russo Decl. ISO Mot., Ex. 3 ¶ 7, ECF 12-3. As such, this argument is moot.

Finally, Plaintiff argues the Terms allow Defendant to modify the provisions without reasonable notice. Opp. at 24. Even assuming that this argument applies equally to the delegation provision, the Ninth Circuit has held that "a unilateral modification clause does not render the arbitration provision substantively unconscionable because [the defendant] is limited by the implied covenant of good faith and fair dealing." *Wiseley*, 709 F. App'x at 864 (citing *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1033 (9th Cir. 2016)). Moreover, this argument is especially weak here, where Plaintiff actually received notice of the existence of the applicable Terms.

Thus, Plaintiff has not demonstrated that the delegation provision is substantively unconscionable and thus unenforceable here.

### D. A Stay of This Action Is Appropriate

Defendant primarily asks the Court to compel arbitration and dismiss all of Plaintiff's

claims because the arbitration provision covers each of Plaintiff's claims here and the Court has discretion to stay or dismiss. Mot. at 21. Plaintiff does not state a preference on a stay versus dismissal. The Court is not entirely convinced that it has discretion to dismiss here. Because the arbitrator must determine "whether [the parties'] arbitration agreement applies to the particular dispute," *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019), the Court cannot say whether all of the claims are arbitrable. None of the courts in Defendant's cited cases determined that the threshold question of arbitrability is for the arbitrator. *See id.* (citing *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 638 (9th Cir. 1988); *Tompkins*, 2014 WL 2903752, at *18; *Hamrick v. Aqua Glass, Inc.*, 2008 U.S. Dist. LEXIS 71402, *19 (D. Or. Feb. 20, 2008)). In any event, even if the Court does have such discretion, the Court believes that a stay of the litigation is more appropriate, at least until the arbitrator makes the initial determination as to arbitrability, so that that statute of limitations will not run on claims that may ultimately not be arbitrable.

## IV. ORDER

Based on the foregoing, Defendant's motion to compel arbitration is GRANTED and this action is STAYED until the arbitrator determines whether the arbitration provision covers the claims asserted here. The parties are to submit a joint status report re arbitration every 120 days from the date of this Order, informing the Court of the progress of the arbitration. Within 14 days of the arbitrator's decision as to whether the arbitration provision applies to Plaintiff's claims, the parties shall submit a status report to the Court informing it of the arbitrator's decision. If the arbitrator determines that each of Plaintiff's claims is covered by the arbitration provision, the Court will dismiss this action. Otherwise, the action will remain stayed until the arbitration is completed.

**IT IS SO ORDERED.**

Dated: May 3, 2019

_____
BETH LABSON FREEMAN
United States District Judge

20